UNITED STATES v. ORIENTAL AMERICAN CO.

(Circuit Court, D. Oregon.   March 5, 1904.)

No. 2,784.

1. CUSTOMS DUTIES—CLASSIFICATION—REFINED COCOANUT OIL—COCOA-BUT-
TERINE.
    As to certain cocoanut oil of the melting point of 70° to 75° F., which
has been purified and rendered suitable for culinary purposes and the
manufacture of high-grade soaps, and which is not susceptible of the
same uses as cocoa-butter, *held*, that the article is not subject to duty
as "cocoa-butterine," under paragraph 282, Tariff Act July 24, 1897, c.
11, § 1, Schedule G, 30 Stat. 172 [U. S. Comp. St. 1901, p. 1652], but is free
of duty under paragraph 626 of said act (section 2, Free List, 30 Stat.
199 [U. S. Comp. St. 1901, p. 1685]) as cocoanut oil.

2. SAME—COCOA-BUTTERINE.
    Cocoa-butterine, as provided for in paragraph 282, Tariff Act July 24,
1897, c. 11, § 1, Schedule G, 30 Stat. 172 [U. S. Comp. St. 1901, p. 1652],
consists of products made in imitation of cocoa-butter, and adapted for
use as a substitute therefor.

Edwin Mays, for the Government.
P. L. Willis and Guy G. Willis, for defendant.

BELLINGER, District Judge.   The tariff act provides that cocoa-
nut oil, with other enumerated commodities, "when imported shall
be exempt from duty."   Act July 24, 1897, c. 11, § 2, Free List, par.
626, 30 Stat. 199 [U. S. Comp. St. 1901, p. 1685].   The defendant im-
ported 46,912 pounds of refined cocoanut oil, which was so classified
by the customs officers at this port, but which, after analysis by the
United States chemist at New York, was reclassified by them, under
instructions from the Secretary of the Treasury to the Board of Gen-
eral Appraisers, as "cocoa-butter or cocoa-butterine."   Paragraph 282,
Tariff Act July 24, 1897, c. 11, § 1, Schedule G, 30 Stat. 172 [U. S.
Comp. St. 1901, p. 1652].   When so reclassified, the merchandise im-
ported became liable to a duty aggregating $1,641.92, for the recovery
of which this action is brought.

Cocoa-butter is produced from the beans of the cacao or chocolate
tree; the word "cocoa," used in this connection, being a corruption of
the word "cacao."   The importation in question is made from the fleshy
part of the cocoanut, a product of the cocoa palm.   All products made
in imitation of cacao or cocoa-butter, and adapted to its use, are classi-
fied as cocoa-butterine, and are dutiable.

It is conceded by the government that the importation in question
is refined cocoanut oil.   The reason given for classifying it otherwise
is that it is in fact cocoanut oil deodorized and prepared for edible pur-
poses, that the refining process has rendered it agreeable to the taste
and edible, and that it is not placed on the market under the name of
"cocoanut oil," but under various names indicating a different product
and use from cocoanut oil, such as "Mannheim butter," "vegetable but-
ter," etc.   Such is the effect of the report of the United States chemist
at New York, which has been admitted in evidence on behalf of the
government.   Two cases are cited in this report in support of the con-

clusion reached. In one of these cases the merchandise in question was invoiced as "nucoa butter," an article used chiefly by confectioners as a substitute for cocoa-butter. It is described as a hard butter, manufactured from cocoanut oil by subjecting the oil to hydraulic pressure until the soft oils are expressed from it, when the hard oil remaining is refined by careful washing with steam, according to a patent process. The extra-refined oil resulting is then colored with yellow coloring matter, presumably to give it a resemblance to cocoa-butter. The melting point of this product is 87° F. It is represented that it is "as good and genuine an article for chocolate thinning as cocoa-butter itself"; that it is successfully used instead of cream in the manufacture of caramels, and renders wax and wrappers unnecessary. The Board of United States General Appraisers found that this manufacture was not the cocoanut oil of commerce, but a product of that oil, and dutiable, and this decision was affirmed in the Circuit Court of Appeals for the Seventh Circuit. Apgar v. United States, 78 Fed. 332, 24 C. C. A. 113. In the other case the article imported was a product of cocoanut oil obtained by "eliminating the softer oils and the free fatty acids, thus raising the melting point and removing the rancidity found in the cocoanut oil of commerce." The Board of General Appraisers held that this product had been advanced beyond the condition of an oil, and was a substitute for cocoa-butter. Decision of General Appraisers, In re Wood, G. A. 5,353 (T. D. 24,495). A sample of the merchandise which was the subject of this decision (No. 5,353) was procured by the attorney for the United States, and is made an exhibit in this case, together with a sample of unrefined cocoanut oil, and one of the merchandise which is the subject of this action. These three samples are marked as Exhibits 1, 2, and 3, respectively. They were marked by the examining chemist as 2,661, 2,662, and 2,663, respectively, and the references to them in the testimony are by these numbers. Prof. Knisely, chemist at the State Agricultural College in this state, at the instance of the attorney for the United States, made an analysis of these three products in order to determine by comparison whether Exhibit No. 3 (Chemist's No. 2,663), the merchandise imported, has been by process of manufacture advanced beyond the condition of an oil, so as to constitute it a cocoa-butterine, under the decisions of the Board of General Appraisers in the cases referred to. Tried by all of these tests, some 12 in number, no appreciable deviation was found in the imported merchandise from the unrefined oil. The two articles differed equally in character from Exhibit No. 1 (Chemist's No. 2,661), the article held to be a cocoa-butterine in the later of the two cases upon which the report of the chemist at New York is based.

Mr. Loebell, chemist and manager for the oil mills at Singapore, where the importation was refined, testifies as a witness in defendant's behalf that his company manufactures three classes of cocoanut oil, designated as No. 1, No. 2, and No. 3. The last is an inferior grade of oil, and is chiefly used in the country where manufactured for lighting purposes. None of it is exported. No. 1 is white, free from rancidity, smell, and taste, and is used for culinary purposes and for making high-grade soap. No. 2 is used for culinary purposes by the Chinese and for soap-making. There is only slight variation in the melting

point of these three oils, such as will be found in all cocoanut oils—the melting point being from 70° to 75° F., while the melting point of cocoa-butter is 85° to 95°. This witness testifies that the No. 1 oil—the oil involved in this action—is not produced by the elimination of the softer oils, as was the case with the manufacture involved in the cases cited; that this oil is "the entire cocoanut oil in the same state as it is contained in the fresh cocoanut, without any of the lower or higher melting parts having been removed"; that cocoa-butter is made from the bean of the cacao or chocolate tree, by heating it up between 60 and 80 degrees centigrade, and pressing it under hydraulic pressure, thus separating the fat, which comprises 40 to 45 per cent. of the whole, from the nonfatty part. The remaining dry substance is ground up and sold as cocoa. This witness further testifies that he has made experiments to determine whether the imported product could be adapted to the purposes for which cocoa-butter is used, by trying to raise its melting point far enough (some 15° F.) to make it a suitable substitute for such butter; that this can only be done by adding certain higher melting substances to it, or removing some of the lower melting parts from it; that neither of these methods is practicable in Singapore, since, owing to the high temperature of that climate, the employment of a refrigerating plant would be necessary, while it can be done in other countries at ordinary temperature at a considerably less expense. The witness explained the process of separating the high and low melting parts of the fats included in the cocoanut oil. He exhibited a sample of Cochin oil, a kind of cocoanut oil that comes from Cochin, and that comes in free of duty. He testifies that this is exactly the same thing as the merchandise imported by the defendant, with the exception of having a little more free fatty acids.

The elimination of free fatty acids and the softer oils from the cocoanut oil of commerce adapts it for use as a substitute for cocoa-butter. This has been decided. No board or court, so far as I am advised, has gone the length of holding that removal of the free fatty acids without raising the melting point of the oil adapts it for use as such substitute. It renders it edible and adapts it to general culinary use. But edible oils are not necessarily butter, or imitations of it; nor is rancidity, which is a manifestation of free fatty acids, a characteristic of cocoanut oil. The oil made from the fresh nut is free from it, sweet and edible. The so-called cocoanut oil of commerce contains it in varying degrees, depending on the condition as to cleanness and freshness of the copra, or dried kernel of the nut, from which it is made. The refining process, which constitutes what is called the "manufacture" of the oil, merely removes from it the impurities due to the manner in which the kernel is handled and dried, and to its partial decay. There is no standard of purity by which the cocoanut oil of commerce is known. That oil, for anything that appears to the contrary, may be a pure and edible oil. An edible cocoanut oil is not a butter because it is edible. Other vegetable oils, like olive oil and cotton seed oil, are edible, and, with butter, are used in cooking as substitutes for the fat of swine. The unrefined cocoanut oil is used for culinary purposes by Chinamen in the Straits Settlements. It must be assumed that whether an oil is an oil or a butterine does not depend upon the degree of rancidity

it has, by which its general culinary use is affected. A product, to be dutiable as cocoa-butterine, must be useful as a substitute for cocoa-butter. It must be an artificial substitute for cocoa-butter. Such is the holding of the Board of General Appraisers.

As already appears, cocoa-butter is a product of the bean of the cacao or chocolate tree. The oil from cocoanuts, to be classed as cocoa-butterine, must be an imitation of this cacao or cocoa butter. It must, in other words, be an artificial cocoa-butter. The testimony in the case shows a wide difference between the two articles. One of the witnesses, a dealer who has sold cocoanut oil of the manufacture in controversy for a year and a half, testifies that he never offered it for sale, or knew of any one else offering it, as cocoa-butterine; that it differs in appearance from cocoa-butterine; that there are, of the imported butterines and those manufactured here, some 12 or 15 different cocoa-butterines; that they are all solids, with a melting point of about 90° F., and are usually sold in cakes, wrapped in paper, and packed in cases, while the oil in question melts at about 80° completely and becomes a liquid, and is sold in hermetically sealed packages; that the two products differ in color, in texture, and in the uses to which they are applied; that cocoa-butterine is sold to confectioners and pharmacists as a substitute for cocoa-butter; that in the pharmaceutical trade the cocoa butter and butterines are largely used for suppositories; that they are similar in color, in texture, in the nature of the fracture when broken, and in the degree of melting; that in many cases the odor of the cocoa-butter is attempted to be introduced in the butterines, not always successfully, but that they are put up in the same manner, packed in the same weight of packages, and bear, as nearly as an imitation may bear, all the characteristics of cocoa-butter; that they are readily recognized by every one in the trade; that confectioners refuse to buy the oil in question because its low melting point makes it entirely unsuitable as a substitute for cocoa-butter. The testimony of the confectioners is that the importation in question is not used as a substitute for cocoa-butter; that any sweet, clean fat can be used, to a limited extent, in thinning chocolate; that most fats dissolve at a very low degree, while cocoa-butter, because it melts at a higher degree, is more suitable for thinning chocolate, "so the chocolate won't dissolve and spread"; and that, in the confectioner's business, cocoa-butter is chiefly used for this purpose. Some of these witnesses testified that they had used the cocoanut oil in question, but it was not successful; that it was no more suitable for their use than lard or cotton seed oil. From the testimony in the case it appears that this cocoanut oil is used chiefly for soap-making, and that more than three-fourths of the importation on account of which this action is brought was purchased by one manufacturer for such use.

From these facts, I conclude that the merchandise in question is not an imitation of, nor a substitute for, cocoa-butter, and that it is not dutiable under the tariff act.